# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| **TORRAY BAYLOR**<br>945 Division Ave NE<br>Washington, DC 20019<br><br>**ANTONIO DORSEY**<br>6209 Sligo Parkway<br>Chillum, MD 20782<br><br>**KEVON MCDONALD**<br>14206 Dennington Place<br>Rockville, MD 20853<br><br>**KYM THORNTON**<br>6079 Little Lane<br>Montgomery, AL 36117 | **Case Number:** |

-    on behalf of themselves and others
   similarly situated -

      **Plaintiffs,**

**v.**

**HOMEFIX CUSTOM REMODELING CORPORATION f/k/a HOMEFIX CORPORATION**
1506 Joh Avenue, Suite 188
Halethorpe, MD 21227

    <u>**Serve on**</u>:
    Tope Lala
    Resident Agent
    13003 Twelve Trees Court
    Clarksville, MD 21029

**TOPE LALA**
13003 Twelve Trees Court
Clarksville, MD 21029

**KEITH SINNOTT**
1766 Rochester Street
Crofton, MD 21114

**ADAM SHAMPAINE**
1490 Downham Market
Annapolis, MD 21401

**Defendants.**

## CLASS AND COLLECTIVE ACTION COMPLAINT

### Introduction

1.       Homefix Custom Remodeling Corporation ("Homefix") is a residential remodeling company operating in Maryland, Washington D.C., Virginia, and other states. Homefix, through its President & Owner Tope Lala, Chief Executive Officer Adam Shampaine, and Senior Vice President & Chief Marketing Officer Keith Sinnott ("Individual Defendants"), engages in a multi-level or pyramid marketing operation that relies on underpaid and mistreated employees to maximize revenue.

2.       At the bottom of Homefix's marketing pyramid are the "Lead Developers." Lead Developers are an army of workers—divided into teams, which make up larger groups called "Legions"—who spend long hours canvassing door-to-door and/or staffing trade show booths and retail kiosks.  Members of this army are plentiful but treated poorly, resulting in high turnover.  Lead Developers are charged with simply developing "leads" for Homefix sales representatives.  Lead Developers cannot make sales.

3.        Defendants recruit Lead Developers from probation offices, homeless shelters, colleges, bus stops, Metro stations, and other locations with empty promises of making hundreds of dollars per day.  They promise to pay Lead Developers based on the results of leads they generate.  Every member of the hierarchy above Lead Developers also profits from Lead Developers' productivity and labor.  Defendants set quotas and pressure Lead Developers to work long hours and weekends.  As a result, Lead Developers regularly work continuous workdays of 10 hours or more, and between 50 to 80 hours per week generating leads.

4.        Defendants carefully monitor and track Lead Developers' work and monitor it via a centralized database, but they deliberately conceal the results of leads and routinely break their promise to pay Lead Developers per their agreements.

5.        In some weeks, members of the Lead Developer army—essential to the Homefix business model—receive no pay at all.  Effectively, as one Plaintiff put it: "They work you like a slave."

6.        At the same time, Defendants misclassify Lead Developers as "independent contractors" despite treating them as the statutory "employees" they are. Defendants set Lead Developers' daily schedules, require specific training and mandatory meetings, determine their level and rate of pay, and control assignments.  Defendants also verify Lead Developers' employment eligibility and require Lead Developers to sign a broad non-compete agreement that refers to them as "employees."  Defendants further direct the creation of independent limited liability companies to attempt to avoid direct liability for various employer obligations.

3

7.      Through this scheme, the Homefix Defendants deny Lead Developers the bedrock protections guaranteed to employees, including the right to a minimum wage for all hours worked and the right to an overtime premium for hours worked in excess of forty in a workweek.

8.      Defendants also discriminate against Lead Developers according to their race.  In assigning Lead Developers to a particular canvassing turf, Defendants segregate white Lead Developers from non-white Lead Developers, directing each group, respectively, to a similarly segregated white or non-white neighborhood.  This practice allows white Lead Developers to earn more money than non-white Lead Developers because it provides them access to higher income homeowners who have higher home values and credit scores.  Based on Plaintiffs' experiences, Defendants' race-based assignments increase the likelihood of obtaining a productive lead, the possible financial value of that lead, and ultimately, whether a Lead Developer is likely to advance from the lowest rung of the pyramid to more profitable employment with Defendants.

9.      Lead Developers now challenge Defendants' failure or refusal to properly classify them as employees and pay them their earned minimum and overtime wages; Defendant Homefix's failure or refusal to pay according to its employment agreement; and Defendant Homefix's use of race-based criteria in canvassing assignments, which unlawfully denies non-white Lead Developers  benefits under the employment contract afforded white Lead Developers.

10.     Plaintiffs Torray Baylor, Antonio Dorsey, Kevon McDonald, and Kym Thornton bring this civil action on behalf of themselves and all those similarly situated

4

who performed work as Lead Developers for Defendants on or after the date that is three (3) years before the filing of the instant complaint.  Plaintiffs seek to recover any and all available damages stemming from (a) Defendants' willful failure to pay Lead Developers their earned wages, including minimum and overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*; the Maryland Wage and Hour Law ("MWHL"), *id.* at §§ 3-401 *et seq.*; the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. §§ 3-501 *et seq.*; the D.C. Wage Payment and Collection Law ("DCWPCL"), D.C. Code § 32-1301 *et seq.*; and the D.C. Minimum Wage Revision Act ("DCMWRA"), D.C. Code § 32-1001 *et seq.*; (b) Defendant Homefix's breach of contract in violation of Maryland, Virginia, and District of Columbia common law; and (c) Defendant Homefix's race discrimination in their employment contracts in violation of 42 U.S.C. § 1981.

## **Jurisdiction and Venue**

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

12.     This Court has supplemental jurisdiction over the state law claims because they are so related to Plaintiffs' federal FLSA claim that they form part of the same case or controversy under Article III, Section 2 of the U.S. Constitution.

13.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)-(c) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district and at least some Defendants are residents of this district.

## Parties

14.     Plaintiff Torray Baylor is a non-white Washington, D.C. resident who Defendants employed as a Lead Developer.

15.     Plaintiff Antonio Dorsey is a non-white Maryland resident who Defendants employed as a Lead Developer.

16.     Plaintiff Kevon McDonald is a non-white Maryland resident who Defendants employed as a Lead Developer.

17.     Plaintiff Kym Thornton is a non-white Alabama resident who Defendants employed as a Lead Developer in Virginia and Maryland.

18.     As required by the FLSA, 29 U.S.C. § 216(b), each Plaintiff has given his written consent to become a party to this action.  True and correct copies of Plaintiffs' FLSA consent forms are attached as Exhibit A.

19.     Defendant Homefix is a Maryland corporation headquartered in Halethorpe, Maryland.  At all times relevant to this action, Homefix has been an enterprise engaged in interstate commerce or in the production of goods for commerce, within the meaning of the FLSA, and has been Plaintiffs' employer within the meaning of the FLSA, 29 U.S.C. § 203(g); Md. Code Ann., Lab. & Empl. § 3-101(c); the MWHL, *id.* § 3-401(b); the MWPCL, *id.* § 3-501(b); the DCWPCL, D.C. Code § 32-1301(1B); the DCMWRA, D.C. Code § 32-1002(3); and has or had a contractual relationship with Plaintiffs and similarly situated individuals within the meaning of 42 U.S.C. § 1981.

20.     Homefix's gross annual sales made or business done has been $500,000 or greater per year at all relevant times.

6

21.    Homefix is the 18th largest remodeling firm in the United States, earning millions in revenue each year. In 2017, Inc. 5000 reported that Homefix earned $73.9 million in revenue, with a 3-year growth rate of 106%.

22.    Defendant Tope Lala is a resident of Howard County, Maryland.  He is the President and Owner of Defendant Homefix, and at all times relevant to this action, he has exercised operational control over the business.  He had and has the power to hire and fire employees and make decisions regarding employee (or independent contractor) classification, as well as how much and the method by which Defendants pay workers. He closely monitors the leads generated daily.  Defendant Lala is or was Plaintiffs' employer, and the employer of those similarly situated, within the meaning of the FLSA, 29 U.S.C. § 203(g); Md. Code Ann., Lab. & Empl., § 3-101(c); the MWHL, *id.* § 3-401(b); the MWPCL, *id.* § 3-501(b); the DCWPCL, D.C. Code § 32-1301(1B); and the DCMWRA, D.C. Code § 32-1002(3).

23.    Defendant Keith Sinnott is a resident of Anne Arundel County, Maryland. He is a Senior Vice President and Chief Marketing Officer of Defendant Homefix, and at all times relevant to this action, he has exercised operational control over the business. He had and has the power to hire and fire employees and make decisions regarding employee (or independent contractor) classification, as well as how much and the method by which Defendants pay workers. He is the mastermind behind Homefix's marketing operation and closely monitors Lead Developers and the leads that they generate daily. Defendant Sinnott is or was Plaintiffs' employer, and the employer of those similarly situated, within the meaning of the FLSA, 29 U.S.C. § 203(g); Md. Code Ann., Lab. &

Empl., § 3-101(c); the MWHL, *id.* § 3-401(b); the MWPCL, *id.* § 3-501(b); the

DCWPCL, D.C. Code § 32-1301(1B); and the DCMWRA, D.C. Code § 32-1002(3).

24.     Defendant Adam Shampaine resides in Anne Arundel County, Maryland.

He is the Chief Executive Officer of Defendant Homefix, and at all times relevant to this

action, he has exercised operational control over the business.  He had and has the power

to hire and fire employees and make decisions regarding employee (or independent

contractor) classification as well as how much and the method by which Defendants pay

workers.  Defendant Shampaine is or was Plaintiffs' employer, and the employer of those

similarly situated, within the meaning of the FLSA, 29 U.S.C. § 203(g); Md. Code Ann.,

Lab. & Empl., § 3-101(c); the MWHL, *id.* § 3-401(b); the MWPCL, *id.* § 3-501(b); the

DCMWRA, D.C. Code § 32-1002(3); and the DCWPCL, D.C. Code § 32-1301(1B).

25.     At all times pertinent to this action Defendants were joint employers of the

Plaintiffs and those similarly situated within the meaning of the FLSA and its regulations

(including 29 C.F.R. § 791.2), the MWPCL, the MWHL, the DCMWRA, and the

DCWPCL.  Defendants orchestrated and exercised control over the scheme designed to

misclassify and underpay their workers, as described herein.

## FACTUAL ALLEGATIONS RELATED TO ALL CLAIMS

**A. *Defendants' Pyramid Marketing Operation***

26.     Defendants are in the residential remodeling business, servicing customers

in Maryland, Pennsylvania, West Virginia, Delaware, Virginia, North Carolina, and the

District of Columbia.  Defendants sell and perform remodeling services relating to

windows, roofing, siding, doors, gutters, and insulation.

27.     Defendants' business model depends on a large staff of Lead Developers within the Homefix Marketing Department, led by Defendant Sinnott.  Lead Developers canvass neighborhoods and attend events such as trade shows, fairs, and festivals to generate leads for Defendants' sales staff.

28.     Defendants recruit Lead Developers through its website, Craigslist advertisements and posted flyers at bus and Metro stations, at colleges, at homeless shelters, outside of probation offices, and even at a Burger King restaurant.  In most cases, recruits are low-skilled, unemployed individuals.

29.     Upon hiring, Defendants require each Lead Developer to sign an "Independent Contractor Agreement," which states that the Lead Developer is considered an Independent Contractor and "will receive a form 1099 from Homefix Custom Remodeling."

30.     Lead Developers' duties include visiting homeowners and staffing vendor booths at events or kiosks at retailers in Maryland, the District of Columbia, and Virginia to secure leads.

31.     A "lead" is a commitment from a homeowner to meet with Defendants' sales personnel to discuss purchasing remodeling services.  Lead Developers secure leads by talking with homeowners and generating their interest to meet with a Homefix sales representative.

32.     The Lead Developer records interested homeowners' names and contact information and communicates with the Homefix dispatch office to confirm a future sales appointment.  Upon confirmation of the appointment, the Lead Developer receives a

"code" for each lead.  A code is a six-digit identification number generated by Defendants' lead-tracking database.  At this point, the lead is referred to as a "coded lead."

33.     Lead Developers do not have the power or authority to make sales or obtain orders or contracts for Defendants' remodeling services.  Lead Developers do not have information about pricing or how to distinguish between different products.  They do not have access to purchase contracts or the authority to negotiate with homeowners.  In fact, even if a homeowner handed a Lead Developer a credit card, they are not permitted to take the card, let alone complete the sale.  Instead, Lead Developers can only inform the homeowner that "we don't even know how much this is going to cost."  Defendants train Lead Developers to make "rebuttals" to homeowners' inquiries about the sale process.  Defendants require Lead Developers to tell homeowners that any questions relating to price and purchases of remodeling services will be explained by Defendants' sales personnel.

34.     Defendants' training materials recognize the distinction between Lead Developers and sales representatives, explaining: "Without [Lead Developers] scheduling an appointment there would be nobody for the sales people to sell to . . . !"

35.     Unlike Lead Developers, sales representatives are responsible for pursuing and making sales to homeowners.  Sales representatives are part of the Homefix Sales Department, led by the Senior Vice President of Sales.  After Lead Developers make the initial contact and confirm an appointment (a "coded lead"), sales representatives attend the appointment to make an in-person "pitch."  A "pitch" is an attempt to sell

Defendants' remodeling services by Homefix sales personnel.  As part of a pitch, the sales representatives discuss price and differences among products.  The sales representatives engage in high-pressure sales tactics to secure high-profit sales. Ultimately, sales personnel are authorized to negotiate and finalize purchase contracts with homeowners.  Sales personnel are not party to this lawsuit.

36.    Defendants track the work of Lead Developers and sales personnel through a centralized database called Tracker.  Following a Lead Developer's initial conversation with a homeowner, Defendants record the lead and information about the homeowner in Tracker.  Once a sales appointment, or "pitch," occurs, Defendants update Tracker with information about the sale or necessary follow-up, such as whether the homeowner has secured financing.  Tracker enables Defendants to record each coded lead, pitch, and the status of each sale in one centralized location, along with the identity of the responsible Lead Developer and sales representative.

37.    For canvassing, Lead Developers are organized into teams of six to eight people managed by a team leader.  One or more teams make up geographically based "Legions," which are directly supervised by a Legion manager.  The different Legions are identified by number.  During the busy summer season each of the 25 to 40 Legions has approximately 20 to 30 Lead Developers.

38.    As an alternative to Legions, Defendants also created, and instructed its employees to create, numerous limited liability companies ("LLCs").  Defendants recruited individuals who "looked the part" to create LLCs in their names.  Defendants assisted them in completing business entity formation paperwork.  Defendant Sinnott

provided final approval of each of the individuals recruited, and he filed the paperwork from a Homefix office.  Once formed, the companies hired Lead Developers who worked exclusively generating leads for Homefix.

39.     At every level, the Individual Defendants provide close supervision of teams, Legions, and LLCs through review of low-level managers' decisions and direct training of Lead Developers.

40.     The employees in the hierarchy above Lead Developers, as depicted below, also receive some portion of their compensation based on the sales generated from Lead Developers' leads.  For example, when one of Plaintiff Antonio Dorsey's leads resulted in a sale, his team leader, Legion manager, and Senior Vice President Keith Sinnott all received a percentage of the sale, thus profiting from Plaintiff Dorsey's work.



41.     Defendants pressure team leaders and staff above them to recruit new Lead Developers, reminding them that their compensation will increase when their teams generate more successful leads.

42.    Defendants experience extremely high rates of turnover among their extensive base of Lead Developers, with many dozens of individuals, if not more, working less than two months before being terminated or quitting.

**B. *Defendants Employ Lead Developers***

43.    Lead Developers are non-exempt employees of Defendants.

44.    Defendants engage, suffer, or permit Plaintiffs and similarly situated Lead Developers, including those employed by an ostensibly independent LLC, to work continuous workdays from the moment Lead Developers report to a Homefix office, as required, until the moment they either finish their canvassing shift, or return to the Homefix office with their team for a post-shift meeting.

45.    Defendants require all Lead Developers to report to a Homefix office to attend trainings or meetings each weekday prior to traveling to neighborhoods to canvass for leads.  Defendant Sinnott participates in daily meetings and provides instruction to Lead Developers.

46.    New Lead Developers are required to attend an initial training for at least two hours per day for the first two days.

47.    As part of their training, Defendants review hypothetical scenarios and coach Lead Developers about how to motivate homeowners to set an appointment with a sales representative and respond to any objections a homeowner might have.  Defendants provide written instructions and scripts that Lead Developers are trained to use in their encounters with homeowners.

48.    Defendants also train Lead Developers on how to identify problems in a house, such as an aging roof or inefficient windows, to specifically target the initial conversation and increase the likelihood of securing a lead.  Defendants train Lead Developers to plant the seed that a homeowner's home is in disrepair or inadequate, so that the homeowner may be more eager to meet with a sales representative to discuss a new roof or windows.

49.    Defendants encourage Lead Developers to study Homefix training materials on their own time to improve their chance of generating a lead.

50.    During the mandatory pre-shift meetings, Defendants review techniques for securing leads, discuss sales numbers and productivity rankings, provide motivational talks, and set quotas for each team.  These meetings and other "pre-shift" activities can last for one to four hours.

51.    Lead Developers are not permitted to canvass if they do not show up for the meetings.  In some circumstances, Defendants refuse to pay for leads generated on a day that a Lead Developer fails to report for initial training or the daily meeting.

52.    Former Vice President of Marketing Mike Trost informed a Lead Developer who generated leads on a particular day, but failed to report to the office to meet his team for the morning meeting, that Homefix will "not pay[] you for those leads."

53.    After the mandatory training or meeting, canvassing teams travel to the assigned neighborhoods throughout Maryland, Virginia, and Washington, D.C. in Defendants' vehicles, which bear the Homefix logo.  Individual Defendants have power

and exercise authority over turf assignments.  Specifically, Defendants Sinnott and Shampaine were part of a text messaging group through which Defendant Sinnott provided instructions to team leaders as to which neighborhoods to visit or avoid.

54.     After arriving at the assigned turf, Lead Developers canvass for at least four hours per day.

55.     Each team is assigned a team leader.  Team leaders also work as Lead Developers.  They are required to canvass alongside the other members of their team. Team leaders generally drive the vans for each team and help track the performance of the Lead Developers assigned to them.  They do not have the authority to hire, fire, set compensation rates, or create schedules for other Lead Developers.  Individual Defendants control these and other employer functions on behalf of Homefix.

56.     Defendants assign some Lead Developers to kiosks at retail outlets such as BJ's Wholesale Club.  As when Lead Developers are canvassing, their primary job is to generate leads for Defendants' sales personnel, who then follow up with the potential customer.

57.     Defendants also assign Lead Developers to staff vendor booths at home trade shows.  Homefix regularly staffs vendor booths at the Dulles Home Show in Virginia each January, as well as home shows in Montgomery County, Maryland; Fairfax, Virginia; Gaithersburg, Maryland; Richmond, Virginia; and elsewhere. Defendants often have multiple booths at trade shows from which Lead Developers engage with visiting homeowners and attempt to secure leads.

58.     Additionally, Defendants assign Lead Developers to work vendor booths at other events and locations, including various fairs and festivals.  For example, Defendants assigned Lead Developers to its vendor space at the Maryland state fair, the Greek Festival in Newport News, and the Neptune Festival of Virginia Beach.  Defendants also staff Lead Developers at vendor booths at shopping malls and events in federal government cafeterias, such as at the U.S. Department of Agriculture.

59.     Defendants assign Lead Developers to work at these events and locations in addition to their regular weekly canvassing work.  Defendants Lala and Shampaine make decisions about the events and festivals in which Homefix participates, and Defendant Sinnott coordinates Lead Developer assignments to these events.

60.     Defendants set Lead Developers' schedules and determine the hours Lead Developers must work, including reporting time, daily meeting or training time, the hours spent generating leads, and the time spent at trade show booths or in-store kiosks.

61.     Defendants pressure Lead Developers to work as much as possible.  For example, Individual Defendants sometimes withhold Lead Developers' Friday paychecks until the weekend to ensure that Lead Developers work on the weekend, when homeowners are likely to be available.  Individual Defendants also promise additional compensation and coordinate rides to the Homefix offices to encourage Lead Developers to work every day.

62.     Defendants require that Lead Developers wear a uniform while canvassing or at events such as trade shows, including vests or hooded sweatshirts, featuring the Homefix logo.

16

63.     Defendants also set daily, weekly, and monthly lead quotas for Lead Developers.  Initially, Lead Developers are expected to secure two coded leads per day; ten coded leads per week; and forty coded leads per month.  Defendants then set specific quotas for Lead Developers each day during the daily pre-shift meeting.

64.     Defendants require that all leads and pitches generated are logged in the Tracker system.  Defendant Shampaine periodically takes calls from Lead Developers to record their leads in Tracker and monitor their productivity.  All leads are the exclusive property of Defendants, and Lead Developers are prohibited from using leads for their own benefit.

65.     Defendants set Lead Developers' rate of pay and Individual Defendants have authority to make final decisions regarding pay rates.  Defendants Lala, Shampaine, and Sinnott provide final approval of the precise dollar amounts attached to Lead Developers' compensation agreements.  Defendant Sinnott communicates any changes in pay rates to Lead Developers, such as the rates to be paid on leads and pitches generated at home shows.  Defendant Lala signs Lead Developers' paychecks, including those of some Lead Developers who worked under ostensibly independent LLCs.

66.     Defendants promise to pay Lead Developers either a set dollar amount per coded lead or per pitch, or a combination of a set dollar amount plus a percentage of sales.  Defendants set a lower dollar amount to pay Lead Developers for coded leads than Defendants pay Lead Developers for pitches.  This is because a coded lead does not always result in a face-to-face sales pitch because, for example, homeowners may cancel or fail to show up for an appointment.  For leads generated at home shows, Defendants

17

often pay out less because there is an increased chance that customers will not follow through to a sale. Defendants also promise team leaders a percentage of any sales resulting from leads generated by their teams.

67.     Lead Developers are not salespeople. Rather, Lead Developers are generally hired with little work experience (sales or otherwise); they are trained to obtain leads; they are not trained or permitted to sell; they are not required to obtain a commitment to buy from homeowners; they are subject to significant supervision from Defendants through daily meetings, route assignments, and ongoing training; they are not highly compensated; and most of their compensation is tied to a sales representative, who is part of an entirely different unit at Homefix.

68.     Although Defendants require Lead Developers to sign Independent Contractor Agreements and issue 1099 forms rather than W-2 wage statements, they also require Lead Developers to sign paperwork that documents their status as "employees." Specifically, Defendants require each new hire to sign federal Form I-9, which employers use to verify the identity and employment authorization for individual employees. "Independent contractors" are not required to sign I-9 forms.

69.     Defendants require each Lead Developer to sign a broad non-compete agreement, which refers to the Lead Developer as an "employee."

70.     Lead Developers who work under a Homefix-created LLC, rather than a Legion, are likewise employees of Homefix. The LLC Lead Developers work exclusively generating leads for Homefix. Defendants require them to attend Homefix training, follow Homefix scripts, and wear Homefix uniforms. Defendants promise them

compensation according to the common per-lead or per-pitch pay scheme.  In at least some cases, Defendant Sinnott delivers Homefix-branded paychecks to the LLC Managers to distribute to the Lead Developers.  The leads and pitches they generate are reported to and tracked in Homefix's Tracker system.

71.    The LLCs operate out of Homefix offices.  Defendants oversee the creation and operation of each LLC.  As such, the identity of each LLC is indistinguishable from Homefix.

## C. *Plaintiffs' Employment with Defendants*

72.    Defendants employed Plaintiffs and all others similarly situated as Lead Developers during the period of three years before the filing of the instant Complaint.

### i.    Plaintiff Torray Baylor

73.    Defendants employed Plaintiff Torray Baylor from approximately May 2015 until approximately May 2018.

74.    Defendant Keith Sinnott hired Mr. Baylor.

75.    Mr. Baylor spent several months as a Lead Developer before Defendants Shampaine and Sinnott promoted him to manage Legion 11 out of their office in Rockville, Maryland, in approximately October 2015.

76.    In May 2017, Defendants Shampaine and Sinnott demoted Mr. Baylor, after which time he worked as a Lead Developer team leader.

77.    Mr. Baylor remained a Lead Developer until approximately May 2018.

78.    Defendants assigned Mr. Baylor canvassing turfs in Maryland, the District of Columbia, and Virginia throughout his employment.

79.    During his time as a Lead Developer, Mr. Baylor regularly worked approximately six days per week for about 10 to 12 hours per day.

80.    In addition to canvassing, Mr. Baylor worked upwards of 20 events per year.  This includes weekend home shows, during which he worked an average of 10 hours per day on Saturdays and Sundays staffing Defendants' vendor booth, and government outreach events, which required staffing a booth in a government cafeteria for an average of 6 hours per day, between 10 a.m. and 4 p.m. for two days at a time during the week, followed by several hours of neighborhood canvassing.

### ii.  Plaintiff Antonio Dorsey

81.    Defendants employed Plaintiff Antonio Dorsey as a Lead Developer from approximately September 2015 until approximately May 2018.

82.     Defendant Keith Sinnott hired Mr. Dorsey.

83.    Defendants assigned Mr. Dorsey canvassing turfs in Maryland, the District of Columbia, and Virginia throughout his employment.

84.    Mr. Dorsey regularly worked approximately six days per week for about 8 to 10 hours per day.

85.    In addition to canvassing, Mr. Dorsey worked approximately 10 events per year, staffing Defendants' vendor booths, during which he worked an average of 10 hours per day on Saturday and Sunday for each event.  He generally did not work his usual canvassing schedule on weekend days when he was staffing an event.

### iii.    Plaintiff Kevon McDonald

86.    Defendants employed Plaintiff Kevon McDonald as a Lead Developer from approximately November 2016 through May 2018.

87.    Defendant Keith Sinnott hired Mr. McDonald.

88.    Defendants assigned Mr. McDonald canvassing turfs in Maryland, the District of Columbia, and Virginia throughout his employment.

89.    Mr. McDonald regularly worked approximately seven days per week for about 7 hours per day on weekdays and about 3 hours per day on weekends.

90.    In addition to canvassing, approximately twice per month, Mr. McDonald worked at least one 9-hour shift staffing a vendor booth for Defendants at events, including home shows at the Dulles Expo Center or in Virginia Beach, Virginia.  He generally did not work his usual canvassing schedule on weekend days when he was staffing an event.

### iv.    Plaintiff Kym Thornton

91.    Defendants employed Plaintiff Kym Thornton as a Lead Developer from approximately 2010 until early 2018, and then again from the summer of 2018 until December 2018.

92.    Defendant Keith Sinnott and Defendant Adam Shampaine hired Mr. Thornton.

93.    Defendants initially hired Mr. Thornton in the spring of 2010 as a telemarketer for Defendants, but transferred him to Lead Developer after a few months.

94.     Defendants assigned Mr. Thornton canvassing turfs in Virginia and Maryland.

95.     Mr. Thornton regularly worked approximately six days per week for about 8 to 12 hours per day.

96.     In addition to canvassing, approximately 20 weekends per year, Mr. Thornton worked shifts of at least 12 hours on Saturdays and Sundays, staffing a vendor booth for Defendants at events, including the Greek Festival in Newport News, the Neptune Festival of Virginia Beach, and the Dulles Home Show.  He generally did not work his usual canvassing schedule on weekend days when he was staffing an event.

97.     In late summer of 2018, Defendants assigned Mr. Thornton to work as a Lead Developer at a wholesale retail kiosk.  For several months, Mr. Thornton was assigned to BJ's Wholesale Clubs to develop leads among Club members.  Mr. Thornton's normal schedule at the kiosks was six hours per day, Monday through Saturday, at Clubs in Norfolk, Chesapeake, and Virginia Beach, Virginia.  Defendants required Mr. Thornton to attend mandatory meetings of one to three hours in duration on Fridays prior to his retail kiosk shift during this period.  Approximately once or twice per week, Defendants required Mr. Thornton to work a double-shift of 10 to 12 hours to fill in for other Lead Developers.

**D. *Defendants' Failure to Pay Minimum and Overtime Wages***

98.     Plaintiffs and those similarly situated worked continuous workdays that included reporting to the Homefix office for mandatory pre-shift meetings, trainings and/or recruitment work, travel time to and from their assigned canvassing turf,

canvassing to generate leads, and post-shift meetings.  Additionally, Plaintiffs and all those similarly situated worked trade shows or similar events several times per year.

99.    Defendants misclassified Plaintiffs and those similarly situated as independent contractors.

100.    Defendants did not compensate Plaintiffs and those similarly situated according to the number of hours they worked.

101.    The compensation Defendants paid to Plaintiffs and similarly situated Lead Developers, when divided by the number of hours they worked per week, regularly fell below the applicable minimum wage rates.

102.    In weeks that Plaintiffs and those similarly situated were unsuccessful in generating a coded lead or pitch, and were not credited with any remodeling sales, they received no compensation at all.

103.    Defendants failed or refused to pay Plaintiffs Baylor and McDonald, and others similarly situated, any compensation for their final week of work.

104.    Plaintiffs McDonald, Thornton, and Baylor each worked for Defendants for one or more weeks without any compensation within the last three years.

105.    Most weeks, Plaintiffs and similarly situated Lead Developers worked in excess of 40 hours per workweek.

106.    Defendants failed to pay Plaintiffs and others similarly situated an overtime premium when they worked more than 40 hours in a workweek.

107.    Defendants usually paid Plaintiff Torray Baylor approximately $500 to $600 per week during his employment as a Lead Developer.  Accounting for his usual

weekly work schedule during that period, Mr. Baylor's effective hourly rate was between $6.25 and $10.00.

108.    Mr. Baylor never received an overtime rate of 1.5 times his regular hourly rate when he worked in excess of 40 hours per workweek.

109.    Defendants usually paid Plaintiff Antonio Dorsey approximately $500 to $600 per week.  Accounting for his usual weekly work schedule, Mr. Dorsey's effective hourly rate was between $7.14 and $12.50.

110.    Mr. Dorsey never received an overtime rate of 1.5 times his regular hourly rate when he worked in excess of 40 hours per workweek.

111.    Defendants usually paid Plaintiff Kevon McDonald approximately $100 to $450 per week.  Accounting for his usual weekly work schedule, Mr. McDonald's effective hourly rate was between $2.13 and $10.98.

112.    Mr. McDonald never received an overtime rate of 1.5 times his regular hourly rate when he worked in excess of 40 hours per workweek.

113.    Defendants usually paid Plaintiff Kym Thornton approximately $300 to $700 per week.  Accounting for his usual weekly schedule, Mr. Thornton's effective hourly rate was between $3.57 and $16.28.

114.    Mr. Thornton never received an overtime rate of 1.5 times his regular hourly rate when he worked in excess of 40 hours per workweek.

115.    Plaintiffs and similarly situated Lead Developers' wage rates fell below the federal minimum wage rate of $7.25 per hour in some weeks.

116.    Plaintiffs and similarly situated Lead Developers' wage rate also fell below the Maryland minimum wage rate of $8.25 (effective July 1, 2015), $8.75 (effective July 1, 2016), $9.25 (effective July 1, 2017), and/or $10.10 (effective July 1, 2018) per hour for work performed in Maryland.

117.    Plaintiffs and similarly situated Lead Developers' wage rate also fell below the District of Columbia minimum wage of $10.50 (effective July 1, 2015), $11.50 (effective July 1, 2016), $12.50 (effective July 1, 2017), and/or $13.25 (effective July 1, 2018) per hour for work performed in the District of Columbia.

118.    Defendants' failures to pay minimum and overtime wages were willful. Defendants misclassified Lead Developers as independent contractors and created LLC alter egos to avoid paying wages owed, at the same time that Defendants sought to bind Plaintiffs to non-compete agreements as employees, in recognition of their actual status as employees.

119.    Upon information and belief, Defendants fail to maintain records regarding Lead Developers, their hours worked, and wages earned as required by the FLSA, MWHL, and the DCMWRA.

120.    Defendants' failure to pay the compensation promised was willful and not the result of a bona fide dispute.  Defendants' unlawful practices are a central part of their business model.

E. *Defendant Homefix's Failure to Pay Promised Compensation*

121.    Defendants' employment agreements with Plaintiffs and others similarly situated set the terms by which Lead Developers' compensation would be determined and paid, and it created a duty on Defendants to pay accordingly.

122.    Defendants promised to pay a set amount: (a) per coded lead; (b) per pitch; or (c) per coded lead or pitch, plus a percentage of sales.

123.    Defendants initially promised to pay Plaintiff Baylor $40 per coded lead. When Defendants promoted Mr. Baylor to manager of Legion 11, they promised to pay him as wages 1% of the gross amount of sales resulting from any leads in Legion 11, in addition to a base salary.  After Defendants demoted him to Lead Developer team leader, they promised him $200 per pitch and 10% of any sales resulting from the leads produced by his team.

124.    Defendants initially promised to pay Plaintiff Dorsey $100 per pitch.  In early 2016, Defendants promised to pay Mr. Dorsey $200 per pitch.

125.    Defendants promised to pay Plaintiff McDonald $120 per coded lead plus 1.5% of any sales throughout his employment.

126.    Defendants initially promised to pay Plaintiff Thornton $75 per coded lead, but during the relevant statutory period they promised Mr. Thornton $100 per pitch.

127.    Defendants did and do not pay Plaintiffs and similarly situated Lead Developers their promised compensation.  Defendants frequently refuse or fail to pay Plaintiffs and similarly situated Lead Developers, including team leaders and Legion

managers, the compensation that they promised under their contract and which they had a duty to pay.

128.    When Plaintiffs and similarly situated individuals asked Defendants to pay the Plaintiffs for leads the Plaintiffs had developed, or successful pitches or sales from leads Plaintiffs developed, Individual Defendants, on behalf of themselves and Homefix, frequently refused to pay.  In one instance, Defendant Sinnott refused to fully pay Plaintiff Baylor because Individual Defendants were mad at him.  On another occasion, Defendant Sinnott claimed that Homefix was waiting for "bank approval" on a sale in order to justify delaying payment to Plaintiff Dorsey.  Other times, including when Plaintiff McDonald received no paycheck for a week in which he had secured leads, and when Plaintiff Thornton received no paychecks before Christmas each year, Defendant Sinnott provided no explanation for not paying the wages Defendants owed.  He then simply ordered them to get back to work.

129.    Defendants also conceal leads, pitches, and sales in Tracker by applying certain codes to delay or avoid paying Plaintiffs and others similarly situated as promised.

130.    For example, Defendants mark some sales as "RED," meaning there is some outstanding issue delaying the final sale, such as approval of financing or a document awaiting a signature.  Defendants then leave the sale labeled as "RED" in the Tracker system, even after a sale is already complete, and in some cases, the remodeling work has been performed.  For example, on several occasions when Plaintiff Dorsey followed up with homeowners to monitor the status of his leads, the homeowners stated

that the remodeling services they purchased had already been performed.  Yet,

Defendants still had not paid Plaintiff Dorsey.

131.    Defendants leave completed sales "on the ledger," erroneously suggesting

that sales are not yet complete.  This practice allows Defendants to retain the amounts

payable to Plaintiffs and others similarly situated—that is, wages Plaintiffs had earned—

as required by contract, long past when they were due.  In some cases, Defendants left

completed sales "on the ledger" indefinitely, and Lead Developers who generated the

leads resulting in the sales never received the wages they had earned arising from those

sales.

132.    Defendants also falsely code successful leads and pitches as "PM" or "pitch

missed," meaning that the follow up appointment with a homeowner did not occur, when

in fact it had.  This denies Plaintiffs and similarly situated Lead Developers wages they

have earned.

133.    Defendants also assign the "DNC" or "Do Not Call" code to some leads

generated by Lead Developers, prohibiting them from following up with the homeowner

associated with the lead.  This makes it difficult for Lead Developers to learn whether the

sale was completed and whether they are owed compensation.

134.    Defendants do not provide access to Tracker to Lead Developers who are

not team leads or Legion managers.  Accordingly, most Lead Developers cannot confirm

whether Defendants have properly credited them with generating a lead or pitch, whether

a particular lead or pitch resulted in a home remodeling sale, or what amount the Lead

Developer has earned or should be paid.

135.    Defendants also fail or refuse to pay Lead Developers wages owed for their leads, pitches, or sales in a given pay period if they stopped working for Homefix prior to the pay date for that pay period.  This is a common method by which Defendant Homefix violates its duty to pay Plaintiffs and those similarly situated, because many Lead Developers are short-term or seasonal employees who leave after a short time or in the middle of a pay period.

### F.  *Defendant Homefix Discriminated Against Plaintiffs Due to Race*

136.    Defendants frequently assign Lead Developers' territory on the basis of race.  At daily meetings, Individual Defendants, on behalf of Homefix, direct that white Lead Developers canvass predominantly white neighborhoods, and non-white Lead Developers canvass predominantly non-white neighborhoods.

137.    At large trade shows, Defendants operate multiple marketing kiosks, and assign white Lead Developers to staff one kiosk, and non-white Lead Developers to staff another.  Defendants assign white Lead Developers to kiosks in more visible and more highly trafficked areas, while relegating non-white Lead Developers to smaller, less preferential kiosks.

138.    On several occasions, Individual Defendants, on behalf of Homefix, directed lower level managers, including Plaintiff Torray Baylor when he managed Legion 11, to send "all the white guys out to Sterling" (referring to a predominantly white area of Sterling, Virginia), or issued similar race-based assignments.  When Mr. Baylor once proposed sending a group of Lead Developers, including several who were Black, to

canvass in a predominantly white neighborhood in Ashburn, Virginia, Defendant Sinnott reprimanded him, asking "why would you send a bunch of Black guys [there]?"

139.    Executive-level managers, including but not limited to Mike Trost, also refer to white Lead Developers with terms like "premium white stud" and "clean-cut white boy," implying that the race of these individuals made it more likely that they would be successful in generating solid leads that could be turned into sales for Defendants.

140.    In general, the predominantly white areas, to which Defendants disproportionately assign to white Lead Developers, have higher levels of income and wealth, and/or higher household credit scores than the predominantly non-white areas to which Defendants disproportionately assign non-white Lead Developers.

141.    Because income, wealth, and credit scores all impact the likelihood that a Lead Developer will successfully make a lead or pitch or that a pitch or lead will ultimately result in a sale, as well as the value of that sale, Defendants' race-based assignment practices give white Lead Developers higher earning potential and higher actual earnings than non-white Lead Developers.  Further, because success as a Lead Developer is required to advance to more lucrative employment contracts up the Homefix corporate ladder, Defendants policies also deny non-white Lead Developers the ability to advance.  Accordingly, Defendants confer greater contractual benefits to white Lead Developers than to non-white Lead Developers.

142.    Defendants also withhold promotions and other benefits from non-white Lead Developers.  For example, Plaintiff Thornton, who is Black, was promised a

promotion to training manager in the Virginia Beach office by Defendants. Defendant

Homefix delayed the promotion without explanation and directed Mr. Thornton to write a

training manual. Mr. Thornton never received the promotion, but Defendant Homefix

adopted his training manual in the Virginia Beach office. Defendants placed Nate Seiver,

who is white, in the training manager position.

## **Plaintiffs' Collective Action Allegations Under the FLSA**

143.    This action is maintainable as an "opt-in" collective action pursuant to

29 U.S.C. § 216(b) as to claims for unpaid overtime compensation, minimum wages,

liquidated damages, interest, and attorneys' fees and costs under the FLSA.

144.    Plaintiffs were victims of Defendants' common scheme to violate the

FLSA.

145.    Defendants' scheme included misclassifying employees as independent

contractors and failing to pay employees minimum wage for hours worked up to 40 per

week, including by failing to pay any wages at all for certain workweeks.

146.    Defendants' scheme included misclassifying employees as independent

contractors and failing to pay employees' 1.5 times their regular hourly rate or the

minimum wage, whichever is greater, for hours worked over 40 in a week.

147.    Plaintiffs seek collective action status on behalf of all individuals

employed by Defendants as non-supervisory Lead Developers engaged in canvassing or

working vendor booths or kiosks, at any time during the period beginning three years

prior to the date of commencement of this action, through the date of judgment ("FLSA

Collective").

148.     Plaintiffs and members of the FLSA Collective were all similarly subject to Defendants' common practices, policies, or plans requiring or permitting them to perform work for Defendants' benefit without compensation at the FLSA-mandated minimum or overtime wage rates.

149.     Pursuant to FLSA, 29 C.F.R. § 516, Defendants are required to maintain a record of each hour, day, and week worked by any employee.

150.     Similarly situated employees are known only to Defendants, are readily identifiable, and may be located through Defendants' records.

151.     Members of the FLSA Collective may readily be notified of this action and allowed to opt in to it pursuant to 29 U.S.C. § 216(b), for the purpose of collectively adjudicating their claims for unpaid overtime compensation, minimum wages, liquidated damages, interest, and attorneys' fees and costs under the FLSA.

152.     These individuals would benefit from the issuance of notice and an opportunity to join this lawsuit.

153.     Plaintiffs and the members of the proposed collective action should therefore be permitted to pursue their claims collectively, pursuant to 29 U.S.C. § 216(b).

### Plaintiffs' Class Action Allegations

154.     Plaintiffs bring certain state law claims as class action claims pursuant to Federal Rule of Civil Procedure 23(b)(3).

155.     Plaintiff Thornton brings class action breach of contract claims on behalf of all similarly situated Lead Developers who entered into their contracts with Defendants in Virginia.

156.     Plaintiffs Baylor, Dorsey, and McDonald bring class action breach of contract claims on behalf of all similarly situated Lead Developers who entered into their contracts with Defendants in Maryland.

157.     Plaintiffs Baylor, Dorsey, McDonald, and Thornton bring class action claims for Defendants' failures to pay them and members of the proposed Class all wages due and owing for work performed in Maryland, in violation of the MWPCL and the MWHL.

158.     Plaintiffs Baylor, Dorsey, and McDonald bring class action claims for Defendants' failures to pay them and members of the proposed Class minimum and overtime wages for work performed in Washington, D.C., in violation of the DCMWRA, and DCWPCL.

159.     Pending any modifications necessitated by discovery, Plaintiffs Baylor, Dorsey, and McDonald represent the following Class of Lead Developers in their Maryland breach of contract, MWHL, and MWPCL claims:

> **Maryland Class**: Each individual who worked to develop leads for Homefix Custom Remodeling, Inc. in Maryland or entered into their contracts for work developing leads with Defendant Homefix in Maryland since April 2016, but not including any individuals engaged in soliciting or making sales.

160.     Pending any modifications necessitated by discovery, Plaintiff Thornton represents the following Class of Lead Developers in their Virginia breach of contract claims:

> **Virginia Class**: Each individual who entered into their contracts for work developing leads with Defendant Homefix in Virginia since April 2016, but not including any individuals engaged in soliciting or making sales.

161.      Pending any modifications necessitated by discovery, Plaintiffs Baylor, Dorsey, McDonald represent the following Class of Lead Developers for violations of the DCMWA and/or DWPCL:

>    **D.C. Class**: Each individual who worked to develop leads for Homefix Custom Remodeling, Inc. in Washington, D.C. since April 2016, but not including any individuals engaged in soliciting or making sales.

162.      Plaintiffs bring their federal race discrimination claims as class action claims pursuant to Federal Rule of Civil Procedure 23(b)(3).

163.      Pending any modifications necessitated by discovery, Plaintiffs Baylor, Dorsey, McDonald, and Thornton represent the following Class of Lead Developers in their claims under 42 U.S.C. § 1981:

>    **Non-white Class**: Each non-white individual who worked to develop leads for Homefix Custom Remodeling, Inc. since April 2015, but not including any individuals engaged in soliciting or making sales.

164.      Plaintiffs bring their class-action breach of contract claims and state law claims on behalf of themselves and all other Lead Developers who have worked for Defendants in Maryland, Virginia, and/or the District of Columbia at any time from three years prior to the filing of this action, through the last date on which any class member may opt out of any class certified pursuant to Rule 23(b)(3).

165.      Plaintiffs bring their class action race discrimination claims on behalf of themselves and all other Lead Developers who have worked for Defendants at any time from four years prior to the filing of this action through the last date on which any class member may opt out of any class certified pursuant to Rule 23(b)(3).

166.    Members of the proposed Rule 23 Classes are readily ascertainable. The identity of Class members may be determined from Defendants' records, including Tracker and other personnel and wage records required to be maintained under state or federal law.

167.    This action satisfies the numerosity, typicality, adequacy, predominance and/or superiority requirements under applicable law.

168.    *Numerosity*.  Defendants employs over 200 Lead Developers at any given time throughout Maryland, Virginia, and Washington, D.C.  Turnover among Lead Developers is very high, and many individuals work less than a month and receive little or no pay.  Effectively, this turnover means Defendants employ hundreds of Lead Developers to work in the three states each year.  At any given time, Defendants enter into contracts with and assign canvassing turf to upwards of 70 Lead Developers in Maryland and Virginia each.  Defendants assign upwards of 30 individuals to work in Washington, D.C. in a given year.  Lead Developers contracted and working in each of these jurisdictions are subject to Defendants' common policies and practices.  At any given time, Defendants employ at least 40 members of the non-white Class as Lead Developers.  As a result, the Classes are so numerous that joinder of all members in a single action is impracticable.  The disposition of these claims will provide substantial benefits to the Classes.

169.    *Commonality/Predominance*.  There is a well-defined community of interest and common questions of law and fact, which predominate over any questions affecting only individual members of the Classes.  Plaintiffs' wage claims are

fundamentally about Defendants' failures to pay Lead Developers what they earned, and Plaintiffs and members of the Classes suffered similar violations.  Common legal and factual questions, which do not vary among members of the Classes, and which may be determined without reference to the individual circumstances of Class members, include, but are not limited to, the following:

(a) Whether Defendants misclassified Plaintiffs and Class members as independent contractors;

(b) Whether Defendants unlawfully denied Plaintiffs and members of the Class the applicable minimum wage and overtime rate for work they performed in Washington, D.C.;

(c) Whether Defendants unlawfully denied Plaintiffs and members of the Class the applicable minimum wage and overtime rate for work they performed in Maryland;

(d) Whether Defendants unlawfully denied Plaintiffs and members of the Class all earned wages, in violation of the MWPCL;

(e) Whether Defendants unlawfully denied Plaintiffs and members of the class all earned wages, in violation of the DCWPCL;

(f) Whether Defendants' policies and practices of failing to pay all compensation earned to Plaintiffs and Class members violated Virginia common law;

(g) Whether Defendants' policies and practices of failing to pay all compensation earned to Plaintiffs and Class members violated Maryland

common law;

(h) Whether Defendants have a race-based policy for making canvassing assignments;

(i) Whether Defendants' policies or practices for canvassing assignments unlawfully interfered with Plaintiffs' and Class members' right to contract free from racial discrimination.

170.    *Typicality*.  The representative Plaintiffs' claims are typical of the claims of the Classes.  Plaintiffs Baylor, Dorsey, McDonald, and Thornton each worked as a Lead Developer in Maryland and/or Washington, D.C. and were injured by Defendants' failure to pay wages in violation of the MWHL, MWPCL, DCWPCL and/or DCMWRA in a manner typical of the Classes.  Plaintiffs Baylor, Dorsey, and McDonald each entered into their contracts in Maryland and suffered violations of Maryland common law typical of the Maryland Class.  Plaintiff Thornton's claims are typical of the Virginia Class because he entered into his contract with Defendants in Virginia and was injured by Defendants' violations of Virginia laws.  The representative Plaintiffs are all members of the non-white Class and were injured by the same discriminatory practices in which Defendants engaged.  The only difference among Class members will be the amount of damages sustained by the members of the Class, which does not affect liability and does not bar class certification.

171.    *Adequacy of Representation*.  Plaintiffs will fairly and adequately protect and pursue the interests of the members of the Classes.  Plaintiffs understand the nature of the claims herein, and their role in these proceedings, and will vigorously

represent the interests of the Classes.  Plaintiffs have retained class counsel who are experienced and qualified in prosecuting class actions and other forms of complex litigation.  Neither Plaintiffs nor their attorneys have interests which are contrary to or conflict with those of the Classes.

172.     *Superiority/Manageability*.  A class action is superior to all other available methods for the fair and efficient adjudication of this action.  As alleged, Defendants employ or employed hundreds of workers and subjected them to common policies and practices that violate state and federal wage laws, as well as state common law and federal anti-discrimination law.  Individual litigation of the claims of Class members is economically unfeasible and procedurally impracticable.  The individual damages incurred by each member of any class resulting from Defendants' common and systemic wrongful conduct will likely be too small to warrant the expense of individual suits.  The likelihood of individual members of the Classes prosecuting separate claims on the violations alleged is especially remote in this instance, in light of their lack of regular access to Tracker and Defendants' ability to and practice of concealing non-payment.  Even if every person was aware of and could afford individual litigation, the Court would be unduly burdened by individual litigation of cases raising the same common questions.  Individual members of the Classes do not have significant interests in individually controlling the prosecution of separate actions, and there is no other pending litigation by Class members on these claims.  Conversely, individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the Court

resulting from multiple trials of the same factual and legal issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. Relief concerning Plaintiffs' rights under the laws herein alleged and with respect to the Class would be proper.

## <u>COUNT I</u>

**FAIR LABOR STANDARDS ACT**
**(Collective Action for Denial of Minimum and Overtime Wages under Federal Law
as to all Defendants)**

173.    Plaintiffs repeat and incorporate by reference the allegations set forth above.

174.    Defendants were and are employers within the meaning of the FLSA, 29 U.S.C. § 203(g), and are subject to the provisions of the Act.

175.    Defendants' actions violate the FLSA, 29 U.S.C. §§ 206(a)(1) and 207(a)(1).

176.    Defendants' actions were willful.

177.    Defendants are liable, individually and collectively, jointly and severally, to Plaintiffs and the FLSA Collective, for unpaid minimum and overtime wages in such an amount to be proven at trial, plus an additional equal amount as liquidated damages, and reasonable attorneys' fees and costs.

## COUNT II

**MARYLAND WAGE PAYMENT AND COLLECTION ACT**
**(Class Action for Failure to Pay All Wages Timely and Regularly**
**as to all Defendants)**

178.     Plaintiffs repeat and incorporate by reference the allegations set forth above.

179.     Defendants were and are employers within the meaning of the MWPCL, Md. Code Ann., Lab. & Empl. § 3-501 and are subject to the provisions of the Act.

180.     Under the MWPCL, Defendants were required to pay Plaintiffs and members of the Maryland Class all wages for time worked.  For purposes of the MWPCL, "wage" includes "overtime wages" and "any other remuneration promised for service." Md. Code Ann., Lab. & Empl. § 3-501(c).

181.     Defendants failed or refused to pay Plaintiffs and members of the Maryland Class all wages due on their regular paydays in violation of the MWPCL, Md. Code Ann., Lab. & Empl. § 3-502.

182.     Defendants failed or refused to pay Plaintiffs and members of the Maryland Class all wages due for work that they performed before the termination of their employment in violation of the MWPCL, Md. Code Ann., Lab. & Empl. § 3-505.

183.     Defendants' failures or refusals to timely and regularly pay Plaintiffs and members of the Maryland Class all wages due was not the result of a bona fide dispute.

184.     Defendants are liable, individually and collectively, jointly and severally, to Plaintiffs and the Maryland Class pursuant to § 3-507.2 of the MWPCL, for

all unpaid wages in such an amount to be proven at trial, plus liquidated damages, reasonable attorneys' fees and costs, and any other relief deemed appropriate by the Court.

## COUNT III

**MARYLAND WAGE AND HOUR LAW**
**(Class Action for Failure to Pay Minimum Wage and Overtime**
**as to all Defendants)**

185.    Plaintiffs repeat and incorporate by reference the allegations set forth above.

186.    Defendants were and are employers within the meaning of the MWHL, Md. Code Ann., Lab. & Empl. § 3-401 and are subject to the provisions of the Act.

187.    Defendants unlawfully failed or refused to pay Plaintiffs' and Maryland Class members' wages in violation of the MWHL, Md. Code Ann., Lab. & Empl. §§ 3-413(b), 3-415(a) and 3-420.

188.    Defendants are liable to Plaintiffs and the Maryland Class pursuant to §§ 3-427(a) and (d) of the MWHL for unpaid minimum and overtime wages plus an additional equal amount as liquidated damages, reasonable attorneys' fees, and costs.

## COUNT IV

### D.C.  WAGE PAYMENT AND COLLECTION LAW
### (Class Action for Failure to Pay All Wages
### as to all Defendants)

189.      Plaintiffs repeat and incorporate by reference the allegations set forth above.

190.      Defendants were and are employers within the meaning of the DCWPCL, D.C. Code § 32-1301(1B), and are subject to the provisions of the Act.

191.      Under the DCWPCL, Defendants were required to pay Plaintiffs and members of the D.C. Class all wages for time worked.  For purposes of the DCWPCL, "wages" includes "overtime premium;" and "other remuneration promised or owed pursuant to a contract for employment." D.C. Code §32-1301(3).

192.      Defendants violated the DCWPCL by failing to timely pay Plaintiffs all wages due, including wages promised and overtime premiums.

193.      Defendants' actions were willful and not in good faith.

194.      Defendants are liable, individually and collectively, jointly and severally, to Plaintiffs and all members of the Class for all unpaid wages in such an amount to be proven at trial, plus liquidated damages, interest (both pre- and post-judgment), reasonable attorneys' fees, and costs.  D.C. Code § 32-1303(5) and § 32-1308.

## COUNT V

### VIOLATION OF THE D.C. MINIMUM WAGE REVISION ACT
### (Class Action for Failure to Pay Minimum Wages
### as to all Defendants)

195.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

196.    Defendants were and are employers within the meaning of the DCMWRA, D.C. Code § 32-1002(3), and are subject to the provisions of the Act.

197.    Defendants unlawfully failed or refused to pay Plaintiffs and members of the D.C. Class the applicable minimum wage rate, in violation of the DCMWRA, D.C. Code § 32-1003(c).

198.    Defendants' violations of the DCMWRA were willful.

199.    Defendants are liable, individually and collectively, jointly and severally, to Plaintiffs and all members of the Class for unpaid minimum wages in such an amount to be proven at trial, plus liquidated damages, interest (both pre- and post-judgment), reasonable attorneys' fees, and costs.  D.C. Code § 32-1012.

## COUNT VI

### MARYLAND BREACH OF CONTRACT
### (Class Action for Failure to Pay Commissions Promised and Owed
### as to Defendant Homefix)

200.    Plaintiffs repeat and incorporate by reference the allegations set forth above.

201.    Defendant Homefix had a legally enforceable duty to pay Plaintiffs and members of the Maryland Class the per lead, per pitch, and/or percentage of sale amounts

43

promised to each.

202.    Plaintiffs performed the work required to entitle them to payments under the parties' agreement.

203.    Defendant Homefix failed to pay Plaintiffs and members of the Maryland Class as promised.

204.    By failing to pay all compensation promised, Defendant Homefix breached its contractual obligations to Plaintiffs and members of the Maryland Class.

205.    Plaintiffs and members of the Maryland Class were injured by Defendants' breach.

206.    Defendant Homefix is liable to Plaintiffs and members of the Maryland Class for the difference between the compensation promised and the compensation actually paid, and prejudgment interest.

## COUNT VII

### VIRGINIA BREACH OF CONTRACT
**(Class Action for Failure to Pay Commissions Promised and Owed as to Defendant Homefix)**

201.    Plaintiffs repeat and incorporate by reference the allegations set forth above.

202.    Defendant Homefix had a legally enforceable duty to pay Plaintiffs and members of the Virginia Class the per lead, per pitch, and/or percentage of sales promised to each.

203.    Plaintiffs and members of the Virginia Class performed the work required to entitle them to payments under the parties' agreement.

204.    Defendant Homefix failed to pay Plaintiffs and members of the Virginia Class as promised.

205.    By failing to pay all compensation promised, Defendant Homefix breached its contractual obligations to Plaintiffs and members of the Virginia Class.

206.    Plaintiffs and members of the Virginia Class were injured by Defendant Homefix's breach.

207.    Defendant Homefix is liable to Plaintiffs and members of the Virginia Class for the difference between the compensation promised and the compensation actually paid, and prejudgment interest.

## COUNT VIII
### 42 U.S.C. § 1981
### (Class Action for Employment Discrimination
### as to Defendant Homefix)

208.    Plaintiffs repeat and incorporate by reference the allegations set forth above.

209.    Plaintiffs and members of the non-white Class are Black, Latinx, or otherwise not white, and thus members of a protected class on the basis of their race.

210.    Defendants Sinnott and Shampaine, in the regular course of their exercise of supervisory and managerial responsibilities, on behalf of Defendant Homefix, subjected Plaintiffs and members of the non-white Class to intentional racial discrimination, by directing them to perform their marketing duties targeting homeowners in predominantly non-white neighborhoods, while directing their white counterparts to target homeowners in predominantly white neighborhoods.

211.    Defendant Homefix's race-based approach to making assignment decisions had and has the effect of racially segregating their workforce of Lead Developers.

212.    Because, in general, the predominantly non-white neighborhoods where Defendants assigned Plaintiffs and members of the non-white Class have lower average household incomes, wealth, and/or credit scores than the predominantly white neighborhoods where Defendants assigned white Lead Developers, Defendant Homefix's race-based approach to making assignment decisions had and has the effect of depressing the potential and actual wages earned by Plaintiffs and all those similarly situated, reducing the value of their employment contracts and their ability to advance within the company, on the basis of these individuals' race.

213.    Defendant Homefix is liable to Plaintiffs and the non-white Class for compensatory damages, lost wages, reasonable attorneys' fees, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant them the following relief:

a)    Certify this matter as a collective action under the FLSA, pursuant to 29 U.S.C. § 216(b);

b)    Grant judgment against Defendants, jointly and severally, and in favor of each Plaintiff and Opt-In Plaintiff, in the amount of each Plaintiff's and member of the FLSA Collective's respective unpaid minimum and overtime wages, plus an equal amount in liquidated damages pursuant to 29 U.S.C. § 216(b);

c)    Certify the state and federal class claims pursuant to Fed. R. Civ. P. 23(b)(3);

d)      Grant judgment against Defendants, jointly and severally, in favor of Plaintiffs and the Maryland Class for all unpaid wages found due, plus liquidated damages pursuant to the MWPCL, Md. Code Ann., Lab. & Empl. § 3-507.2;

e)      Grant judgment against Defendants, jointly and severally, in favor of Plaintiffs and the Maryland Class for all unpaid minimum and overtime wages found due, plus an equal amount in liquidated damages pursuant to the MWHL, Md. Code Ann., Lab. & Empl. §§ 3-427(a) and (d);

f)      Grant judgment against Defendants, jointly and severally, in favor of Plaintiffs and the D.C. Class for all unpaid wages found due, plus an additional three times overtime and non-overtime compensation owed, pursuant to D.C. Code § 32-1300 et. seq.;

g)      Grant judgment against Defendants, jointly and severally, in favor of Plaintiffs and the D.C. Class for all unpaid minimum wages found due, plus liquidated damages, pursuant to D.C. Code § 32-1012;

h)      Grant judgment against Defendant Homefix in favor of Plaintiffs and members of the Maryland, Virginia, and D.C. Classes for damages for Plaintiffs and the Maryland, Virginia, and D.C. Classes arising from Defendant's breaches of contract;

i)      Grant judgment against Defendant Homefix in favor of Plaintiffs and non-white Class members, for damages for each Plaintiff and non-white Class member arising from Defendants' violations of 42 U.S.C. § 1981;

j)      Award Plaintiffs and Class members pre- and post-judgment interest on all amounts owed as allowed by law;

47

k)      Award Plaintiffs costs and reasonable attorneys' fees incurred in this action, as provided in 29 U.S.C. § 216(b); Md. Code Ann., Lab. & Empl. § 3-507.2; Md. Code Ann., Lab. & Empl. § 3-427(a)(3); D.C. Code § 32-1308(b)(1); and 42 U.S.C. § 1988; and

l)      Grant such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a jury trial as to all claims so triable.

Respectfully submitted this 24th day of April, 2019,

_____/s/_____
Monisha Cherayil (Federal Bar No. 18822)
Sally Dworak-Fisher (Federal Bar No. 27321)
PUBLIC JUSTICE CENTER
One North Charles Street, Suite 200
Baltimore, MD 21201
Tel: (410) 625-9409
Fax: (410) 625-9423
cherayilm@publicjustice.org
dworak-fishers@publicjustice.org

Mark Hanna (Federal Bar No. 16031)
Roseann R. Romano (Federal Bar No. 19843)
MURPHY ANDERSON PLLC
1401 K Street NW, Suite 300
Washington, DC 20005
Phone: (202) 223-2620
Fax: (202) 296-9600
mhanna@murphypllc.com
rromano@murphypllc.com

Daniel A.  Katz (Federal Bar No. 13026)
Hannah E. M. Lieberman (Federal Bar No. 05456)
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle NW, Suite 400

Washington, DC 20036
Phone: (202) 319-1000 ext. 135
Fax: (202) 319-1010
Daniel_Katz@washlaw.org
Hannah_Lieberman@washlaw.org

*Attorneys for Plaintiffs*